(7 App. Div. 326)

## PEOPLE v. WILSON.

(Supreme Court, Appellate Division, First Department. June 29, 1896.)

1. LARCENY—EXCLUSIVE POSSESSION OF STOLEN GOODS.
    Evidence that stolen goods were found in the drawer of a bureau containing defendant's clothing, in his bedroom, is sufficient to show exclusive possession of the goods by defendant, though others occupied the room with him.

2. BURGLARY—POSSESSION OF TOOLS—INSTRUCTIONS.
    On a trial for burglary, it appeared that tools of various kinds were found in the rooms occupied by defendant. Some of the tools were such as might be used by mechanics in their work, and others were such as might be used in the perpetration of a burglary. The court charged that the mere finding of tools in the possession of a person that might be used for a burglary is not sufficient in itself, because the tools might have been used for a proper purpose; that the jury must find, if they desired to consider the tools, that they were intended to be used for the commission of a crime; but that the jury could take them into consideration in connection with all the other evidence in the case. *Held*, that the meaning of such instruction was that the tools were not to be considered except in connection with the evidence as to the burglary, and it was therefore proper.

3. CRIMINAL LAW—EVIDENCE MADE COMPETENT BY THAT OF DEFENDANT.
    On a trial for burglary, it appeared that a number of tools were found in defendant's room, some of which were offered in evidence by defendant. *Held*, that it was competent for the prosecution to show the other tools found in defendant's room.

4. SAME—SECOND OFFENSE—PROOF OF PREVIOUS CONVICTION.
    Under an allegation in an indictment that the offense charged was a second offense, it is competent for the prosecution to introduce in evidence the indictment under which defendant was claimed to have been previously convicted under a different name, followed by evidence showing that the person named in the previous indictment was the same as the person named in the indictment under trial.

5. SAME—RELEVANCY OF EVIDENCE.
    On a trial for burglary, it appeared that when defendant, who occupied rooms with a woman, was arrested, he handed something to a man who was with him, saying, "Take this to my wife." *Held*, that it was competent to show that on the same evening the woman left with the cashier of the firm by which she was employed the sum of $500, and did not return, as such evidence would justify an inference that the article sent by defendant to his wife was the money in question.

Appeal from court of general sessions, New York county.

Harry Wilson was convicted of burglary, and appeals. Affirmed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Sumner B. Stiles, for appellant.

John D. Lindsay, for respondent.

PATTERSON, J. The defendant was convicted in the court of general sessions of the peace in and for the city and county of New York of the crime of burglary in the second degree,—a second offense,—and from the judgment of conviction and an order denying a motion for a new trial this appeal is taken.

The indictment upon which the defendant was brought to trial contained three counts; one setting forth that the defendant broke into and entered the dwelling house of one Frances M. Barnes, in the city of New York, on the 28th day of December, 1895, in the nighttime, with intent to steal property belonging to Mrs. Barnes, and that he was assisted by a confederate, one William King. The crime was charged as a second offense. In the second count the defendant was charged with grand larceny in the second degree, as a second offense, and the alleged crime consisted of stealing jewelry belonging to Mrs. Barnes at the time and place designated in the first count. In the third count he was charged, as a second offense, with receiving stolen goods, being the same property as that referred to in the other two counts of the indictment. The circumstances connected with the offenses alleged as burglary and as grand larceny, as they were established at the trial, were substantially as follows: Mrs. Barnes, who resided at No. 239 Central Park west, at the corner of Eighty-Fourth street, in the city of New York, had in her possession on the 28th day of December, 1895, jewelry of about the value of $10,000, which she kept in the middle drawer of a bureau in her own private room on the third floor of the house above mentioned. At about 4 o'clock in the afternoon of that day she saw all the jewelry in the middle drawer of that bureau. It would appear that she remained in her room on that day until about half past 6 o'clock in the evening, when she descended to her dining room to take dinner with her son. The son entered the house at about 6 o'clock. When Mrs. Barnes came from her room, and descended to the main floor, observing that there was some disarrangement of the lace curtains at the front door, she went to rearrange them, and then noticed that the door was shut tight. She remained at dinner with her son until about 7 o'clock, when she returned to her own room upstairs, and there found the middle drawer of the bureau open, and all of the jewelry gone, except two jeweled watches and one pin. On discovering her loss, she called her son, who went upstairs to her room, saw that the jewelry was gone, and then went down again, and found the front door partly open. During the evening, and up to half past 7, there were in the house Mrs. Barnes and her son and three servants, namely, a cook, a maid servant, and a colored man, the latter

of whom went to work in the house at about 6 o'clock, and remained there about 15 or 20 minutes. There was no evidence to show that the defendant was in or about the house or in the neighborhood when the jewels were taken. On the 31st of December the defendant, while walking in the street with one William King, the same person alleged in the indictment to have been his confederate, was arrested by a policeman, and taken to police headquarters. King, upon the defendant being taken into custody, ran away, but was called back by the defendant, and was handed by him something which the policeman did not observe, with the remark, "Take this, and give it to my wife." The defendant, who is a negro, was the lessee and occupant of three rooms at 119 East Eighty-Fourth street. He occupied these rooms with a young white woman, known as Agnes Renshaw; and another woman, said to be the mother of Agnes Renshaw, also lived in the same apartment. Immediately the defendant was taken into custody, the police officers made a search in the rooms, and in a drawer of a bureau in one of the rooms was found secreted a small purse containing a round diamond stone, and in the drawer of a wash stand was found a lot of tools. On the night of the 31st of December, King, the alleged confederate of Wilson, was arrested, and taken to police headquarters, where he was searched, and a square diamond stone was found concealed in the band of his hat. On the trial of the indictment the only evidence to convict the defendant upon either of the charges against him was his possession of the round diamond stone, and his connection with King, upon whom was found the square · diamond. The prosecution undertook to prove that both of these diamonds belonged to Mrs. Barnes, and were part of the booty secured by the person who committed the burglary. That the house was entered, and the jewels abstracted and carried away, was clearly proven, and upon conflicting evidence the jury found that the two diamonds were part of the property stolen from Mrs. Barnes. The principal contest in the case was over the identification of these stones. At police headquarters Mrs. Barnes did not fully recognize them at first, and could not identify them, but she explained at the trial that it was in consequence of the light at the police headquarters being insufficient, it being in the nighttime, and she stated her reason for not being then sure of their identity, viz. that she would not risk a positive statement until she had the opportunity to examine them by daylight. But she did positively identify them at the trial. It appeared in evidence that a few days prior to the burglary Mrs. Barnes had given two diamonds to a diamond merchant, a Mr. Mather, to be reset. She identified them at Mr. Mather's store in Maiden Lane, whither they had been sent by the police authorities. Mr. Mather, upon being called as a witness for the prosecution, and being shown the round and square stones to which reference has been made, positively recognized them as the two diamonds he had received from Mrs. Barnes, and which he had returned to her about the 20th of December. Upon this testimony of the positive identification by the diamond merchant and Mrs. Barnes, the pros-

ecution rested its case on that branch. Opposed to it was the testimony of two lawyers, who merely swore that in October, 1895, they had received from King, while in company with the defendant, two diamonds as security, which resembled those produced on the trial, but they could not identify them. Two other witnesses, claiming .to be experts in diamonds, were called by the defense to show that the round and the square stones produced at the trial were common and ordinary stones, and that they did not possess marks or characteristics which would distinguish them from others, and that they could be identified by no one after the lapse of a few days. Upon the conflicting evidence with reference to this subject the jury found that these diamonds belonged to Mrs. Barnes, and were part of that property which had been stolen from her room on the night of the 28th of December. There was, therefore, proof satisfactory to the jury that some of the fruits of the burglary or robbery were found in the possession of the prisoner and a man charged with being his confederate, and in whose company he was found within a short time after the commission of the crime; and it is not claimed on the part of the defense that competent evidence of the possession of stolen property is not admissible to sustain such an indictment as that upon which the prisoner was tried and convicted. But it is strenuously claimed that the evidence in this case fell short of what the law requires, in that the prosecution failed to show that the possession by Wilson of the round diamond was an exclusive possession; and that all that was proven was that it was found secreted in a bureau drawer in his lodgings. It is true that the courts, in dealing with this subject of the possession by a person of the fruits of a crime, being evidence of such a character as throws upon the possessor of the property the obligation of showing how he came by it, have said that exclusive possession of the whole or some part of stolen property by the prisoner, shortly after the theft, is sufficient, when standing alone, to cast upon him the burden of explaining how he came by it or of giving some explanation of that possession, and that no presumption of guilt can be raised from the possession of stolen property, except where the possession is conscious and exclusive on the part of the defendant; and that, where there are no other circumstances to connect the accused person with the crime than that of possession of the stolen property, the exclusive possession must be established. It is urged by the defense that it cannot be justly held in this case that the defendant was in the exclusive possession of this round diamond, and that there were no other circumstances to indicate that he had any relation to the property taken from Mrs. Barnes' house on the night of the burglary. It certainly cannot be meant by exclusive possession that the property must be found constantly on the person, or constantly under the immediate control of the inculpated party. This diamond was found in a small purse in a bureau drawer in the sleeping room of the defendant, under a pile of clothing consisting only of a man's attire, and the argument is made that, because two white women occupied these rooms with the defendant, therefore others

had an opportunity to put this stolen diamond there without the
knowledge of the defendant, and that a reasonable doubt could be
raised respecting his having the exclusive possession of the prop-
erty. But the mere fact that he shared his lodgings with these
white women does not necessarily diminish the force of the facts
shown concerning the place in which this diamond was found hid-
den, for it was with his personal effects, and in his own, and not
in the women's clothing; besides which the circumstance appears
that when he was arrested the defendant was found in the company
of the man named in the indictment as having been implicated with
him in the burglary, and about whose person some of the plunder
was found concealed. We think, on the whole case, that there was
enough evidence upon this subject of possession to throw upon the
defendant the burden of explaining it to the jury.

Upon the trial it appeared that during the search made in the
defendant's lodgings a great many different tools of various kinds
were found in a drawer of a wash stand in one of the three rooms
of which those lodgings consisted. The only persons who had
constant access to these lodgings were the defendant and the two
women referred to. It is not to be presumed that any one could
enter and leave these lodgings. The tools were, some of them,
such as might be used in the perpetration of a burglary, and others
were only such as might be used by mechanics in their work, or,
as is claimed by the defendant, might be ordinary implements used
by persons who ride bicycles. Upon an examination of the record
it appears that the court at the trial was very careful to instruct
the jury with reference to the effect that the production of these
tools should have upon them. The judge remarked in his charge:

"In this connection I desire to call your attention to some facts or some
evidence that I admitted, as it is my duty to do so. The tools were offered in
evidence. It has been said, and wisely said, by the highest court in this
state, that the mere finding of tools in the possession of a person, that might
be used for a burglary, is not in itself sufficient, because such tools might have
been used for a proper purpose. You must find from the evidence and the
surrounding circumstances, if you desire to consider the tools, that they were
intended to be used for the commission of a crime; but you can take them
into consideration in connection with all the other evidence in the case."

Now if, by this instruction, it were meant that the tools might be
taken into consideration in connection with any other crime, of
course it was error; but the whole of this part of the charge is
susceptible only of the meaning that the tools were not to be taken
into consideration except in connection with the evidence as to the
burglary which was the subject of the indictment, and as to the
exhibition of the tools at all it appears that none of them were
introduced in evidence until after some had been offered by the
defendant's counsel. On this subject the defendant's counsel said
at the trial:

"I desire to have placed upon the record the fact that Mr. Weeks [the
prosecuting counsel] has exhibited a great number of iron instruments here
in court, and I ask that your honor instruct the jury to disregard entirely
that exhibition, as they are not put in evidence, and should never have been
exhibited here, to prejudice the jury against the defendant. The Court: I
understood they were put in evidence. Mr. McLaughlin: No, sir; only one

little tool. Mr. Weeks: The counsel for the defendant offered some of them in evidence. Mr. McLaughlin: I offered a hammer and a nut turner for a bicycle. The Court: I understood they were all in evidence. If they are not in evidence, you must take them away from the sight of the jury. Mr. McLaughlin: They should not be exhibited here. The Court: That is fair. Mr. Weeks: What is your honor's ruling? The Court: Unless they are in evidence, they must be taken away. Mr. Weeks: I would offer them in evidence, but counsel will object that I haven't connected them sufficiently closely with the defendant, or connected them sufficiently with the room where they were found. Mr. McLaughlin: I want them taken away, except the two that I offered in evidence, until you do connect my client with them. The Court: Yes."

Thereupon counsel for the prosecution offered in evidence a key, which was objected to on the ground that the defendant was not connected in any way with that key. The court allowed it. It was one of the implements found in the wash-stand drawer. That key was an instrument which might be used in the perpetration of a burglary, and the defendant was connected with it by its having been found in the drawer of the wash stand in his room. The tools came into the case as evidence through the act of the defendant's counsel in putting some of them before the jury to show that they were tools to be used for innocent purposes. The question of the admissibility on the trial of an indictment of implements such as would be used in the perpetration of a crime was before the court of appeals in the celebrated case of Ruloff v. People, 45 N. Y. 215, where objection was made to the production in evidence of certain implements and papers found in the room and desk of the prisoner. Both the room and desk were used somewhat in common by him and one of his associates, but he was the chief occupant. The articles were taken some time after his arrest, and one of them was identified as being, and admitted by the prisoner to have been, in his possession, as a new invention of a curious thing; and the court held that all of those instruments might be put before the jury. Here only those that were deemed suitable to the perpetration of a burglary were of any consequence, but, as the prisoner's counsel took the responsibility of putting some of them before the jury, it was not incompetent for the prosecution to show precisely what was discovered in the prisoner's room; and under the charge of the judge respecting the matter we do not see that any reversible error was committed with regard to that subject.

It is further claimed on the part of the prisoner that an error was committed by the court in allowing proof of an indictment upon which the prisoner had been previously convicted of the offense of petit larceny. It seems that in 1893 a person claimed to be the defendant was indicted upon a charge of burglary in the second degree. Upon being arraigned for trial on that indictment he pleaded guilty to petit larceny, which plea was accepted, and he was sentenced to one year's imprisonment in the penitentiary and a fine of $150. It was certainly necessary to prove a prior conviction of the defendant of some crime in order to sustain the allegation under the present indictment of a second offense. The contention on the part of the defendant now seems to be that it was incompetent for the prosecution to do anything more

in proving the allegation as to a second offense than to show that there was a conviction and sentence on a prior occasion, and that the proof should be limited merely to that. It certainly would be incompetent for the prosecution in a case of this character to undertake to show a criminal disposition on the part of the defendant by proving independent crimes, but the question on the trial of this indictment as to his having been previously convicted of a crime became in reality one of personal identity, for the prosecution was obliged to show that he had been previously tried and convicted under the name of Charles Edwards. A person giving that name was arraigned on that first indictment, and conviction followed upon his own plea, the plea and sentence being indorsed on the back of that indictment, and that constituted the original record of the sentence, and was but part of the proof of identification. The policeman who arrested the person indicted as Charles Edwards was called upon to identify Harry Wilson as the person indicted under the name of Charles Edwards, and his testimony as to identification depended upon his ability to recognize this prisoner as the same individual he had arrested on the charge of burglary in the second degree contained in the first indictment. We think this evidence was properly admitted as a part of that necessary to fix the identity of the prisoner, so that it might be shown that he was guilty of a second offense.

Another claim of error is made on the part of the prisoner that the prosecution was allowed to show that Agnes Renshaw had on the night of the 31st of December, 1895, left on deposit with the cashier of Bloomingdale Bros., by which firm she was employed as a saleswoman, the sum of $500, and that, after making that deposit, she left, and never returned. She is the woman with whom Wilson lived. We do not find in the record any objection to this evidence on the ground that it was not relevant or competent, but merely on the ground that no connection was shown between this Agnes Renshaw and the defendant, Harry Wilson. The point of this evidence was to show that shortly after the burglary or robbery the defendant was in possession of a large sum of money, which the jury might infer was the proceeds of the crime, and that upon his being arrested he endeavored to rid himself of it. That was a circumstance which we think it was competent for the prosecution to prove. Agnes Renshaw and the prisoner were brought into association by proof. It was shown that a person of that name lived with the defendant; and that when he spoke of his wife he referred to the woman with whom he lived is a fair inference. There was testimony to show that this Agnes Renshaw, who was employed by Bloomingdale Bros. as a saleswoman, had been seen in the company, on Sixth avenue, of Harry Wilson. It was a fair inference also from the proof that at the time of his arrest Wilson desired to get rid of something. After King had taken flight, he was recalled by Wilson, and came within a few feet of him and the police officer at the elevated railroad station, and Wilson said to King, "Take this to my wife." It is true that the policeman does not swear that he saw what was passed, but he swears to the remark,

and on the way down to police headquarters and while on the elevated railroad train Wilson said to the policeman that he was on his way to the bank when he was arrested. While this testimony may not have been particularly forcible or conclusive, it was sufficient to go before the jury to show, as before stated, that the prisoner was endeavoring to get rid of something of value, and that he got rid of it by having it transferred to this woman with whom he lived, who, on the same afternoon, made a special deposit of the large sum of money in a place to which she never returned to demand it.

The defendant has urged as an objection calling for a reversal of the judgment that the indictment contained more than one crime within the meaning of sections 278 and 279 of the Code of Criminal Procedure, but we do not find in the record that the objection now urged was taken at the trial, or that it is presented in such form that we can consider it; and the same may be said of the motion in arrest of judgment.

We think the defendant was properly convicted, and that the judgment should be affirmed. All concur.